IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KARL W. NICHOLS,

                Petitioner,

v.                                          OPINION and ORDER

LANCE WIERSMA, Administrator,                18-cv-829-wmc
Wisconsin Department of Corrections,
Division of Community Corrections,

                Respondent.

---

Petitioner Karl W. Nichols, who is represented by counsel, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 2014 conviction by a Dane County, Wisconsin, jury for one count of first-degree sexual assault of a child. Nichols contends that the conviction should be vacated because: (1) the state breached its duty to preserve potentially exculpatory evidence (specifically, a written list that the victim prepared, which identified changes to statements she had made during her first forensic interview); and (2) his trial counsel failed to address the breach before trial. As explained below, Nichols' petition must be denied because he failed to establish that in rejecting his claims and affirming his conviction, the Wisconsin Court of Appeals (1) unreasonably applied clearly established federal law or (2) based its decision on an unreasonable interpretation of the facts.

BACKGROUND[1]

## A. Criminal conviction for sexual assault of a minor

In Dane County Case No. 2012CF412, Nichols was charged with first-degree sexual assault of a child. The underlying facts accused Nichols of sexually assaulting a four-year old child, M.R.W., on one occasion between September 15 and October 31, 2005, while M.R.W. was staying at his house in Madison, Wisconsin. Unfortunately, M.R.W. did not report the sexual assault until 2011, when she was 10 years old and living in Kansas. After M.R.W. told her mother about the incident, however, she contacted law enforcement authorities in Kansas, who arranged for M.R.W. to meet twice with a forensic interviewer at a local child advocacy center.

During the first of these interviews, M.R.W. explained that she had spent a lot of time at Nichols's house between the ages of four and seven, playing with his son. She also described several sleepovers at his house, during which Nichols's son and she would stay up late. She further stated that Nichols told her to tell her mother that they had gone to bed at 10:00 p.m., despite having actually gone to bed much later. Among the activities that M.R.W. described at these sleep overs was Nichols's son and she "played" wrestling and attacking Nichols, often with little or no clothing, taking off her clothes when she got hot, and Nichols even encouraging her to do so. On one occasion, Nichols even gave her a sponge bath in a basement utility sink after she had been playing with stamps.

As for the specific incident of sexual assault charged, M.R.W. reported that during one sleepover when she could not sleep, she went upstairs and sat with Nichols on a chair.

---

[1] The following facts are taken from Nichols' petition or the state court records provided by Nichols and the state.

2

According to M.R.W., Nichols told her that he wondered what it was like to have a vagina because he did not have one, and he asked if he could touch hers. M.R.W. did not object because she did not think there was anything wrong with it at the time, and Nichols then touched her inside and outside of her vagina with his hands. M.R.W. told the forensic interviewer that the touching happened only once, and that it was difficult to remember how she had felt at the time.

This first recorded interview was provided to the Madison Police Department and Dane County District Attorney's office. That office then asked that a second forensic interview be conducted, so that an MPD detective could participate and M.R.W. could be placed under oath. The second interview was conducted approximately three months after the first one by the same forensic interviewer in Kansas, except this time with an MPD detective participating by phone from Madison. M.R.W. again described her sleepovers at Nichols's house, the sponge bath incident, and the sexual touching incident. She provided a few more details about the touching incident, describing the chair she sat in with Nichols and the pajamas she was wearing. She also reported that it was the only time Nichols had touched her vagina.

Near the end of the second interview, M.R.W. confirmed that everything she had said was true "as far as [she could] remember." (Dkt. #5-10, at 41.) She also affirmed that everything she had said was "the truth and nothing but the truth." (*Id.*) The interviewer asked M.R.W. twice whether she had any questions, and each time M.R.W. answered, "No." (*Id.* at 41, 45.) The interviewer then acknowledged that M.R.W. had brought a notebook with her, and she asked M.R.W. whether she had written some things down that she was wondering about. M.R.W. responded that she had written "some things down that I think I, I changed

3

from the last interview. I think that [Nichols] didn't suggest that I would take my clothes off. I think I took them off and he didn't object." (*Id.* at 46.)

The interviewer responded that M.R.W. had told her the same thing in the beginning of the first interview, then asked whether M.R.W. felt like it was her fault that she had not objected "to any of this." (*Id.*) M.R.W. answered that she had felt like that but felt better after talking to a therapist. The interviewer responded that she was glad M.R.W. felt better, and she suggested that they say goodbye to the detective and find something to drink. As M.R.W. followed the interviewer, she apparently also raised her pad of paper and asked, "First can I tell you, um, the rest of this?" (*Id.*) The interviewer responded, "Sure. We can do that, and then I'm going to take a copy of it so that [the counselor and detective] can have it, too." (*Id.*) The recording of the video portion of the second interview concluded at that point.

Approximately three months after the second forensic interview, the Dane County District Attorney's Office filed a criminal complaint charging Nichols with first-degree sexual assault of a child based on M.R.W.'s statements about the touching incident. Nichols pleaded not guilty to the charge and the case proceeded to a three-day jury trial in November 2013. At trial, the state called as witnesses: M.R.W., her parents, an MPD detective, and two mutual acquaintances of M.R.W.'s and the Nichols's families. The state also introduced the videos and transcripts of the two forensic interviews. The only witness called by Nichols was a former neighbor, who testified that she never observed M.R.W. sleep at the Nichols' house during the relevant time period. Ultimately, the jury found Nichols guilty of the charged offense, and he was sentenced to five years of probation.

**B. Postconviction proceedings in circuit court**

Nichols filed a postconviction motion contending, among other things, that the state failed to preserve and disclose exculpatory evidence -- specifically, M.R.W.'s written list of "changes" from the first forensic interview that she brought with her to the second. The circuit court then held a two-day, post-conviction evidentiary hearing, at which both the forensic interviewer and MPD detective testified. The interviewer testified that she had no specific recollection of what was included in M.R.W.'s list, but thought it was list of things M.R.W. had discussed with her therapist or that she had testified to during the second interview already. (Dkt. #5-27, at 92–94.) The interviewer also testified that if she had felt something on the list needed correcting, she would have addressed it on the record. (*Id.* at 110.) The interviewer further stated that after the second interview, M.R.W. had handed her the list, although she could not remember specifically what she did with the list. The interviewer testified that she would not have retained the list (or any other evidence provided by an interviewee like M.R.W.); instead, she described her normal practice, and what she assumed she did in this case, which was to give such information to a worker from the Department of Children and Families, who, in turn, would send it to law enforcement.

The MPD detective who was present for the second forensic interview also testified at the post-conviction hearing, stating that she was aware M.R.W. had brought a written document with her to the interview, but that she never received a copy of any list and did not follow up with anyone in Kansas regarding the list. (Dkt. #5-29, at 63.) The detective testified that she did not think the list was significant at the time, because she thought that everything in the document had been discussed during the interview already (*id.* at 64), and because she assumed that if something was significant, the forensic interviewer would have explored the

5

issue further. (Dkt. #5-29, at 99.) After Nichols' postconviction counsel requested the list, the detective attempted to retrieve it from several people in Kansas, but without success. (*Id.* at 65–66.)

In a lengthy and detailed decision, the circuit court found that the state's failure to preserve the list violated Nichols' right to due process. (Dkt. #5-2.) The court reasoned that the state's case against Nichols depended entirely on M.R.W.'s credibility, and defense counsel could have used the list to discredit M.R.W.'s memory, honesty and motives. In addition, the court found that the state acted in bad faith by failing to preserve the list once made aware of it, and thereby shirked its constitutional duty to seek and preserve evidence despite reminders and orders from the court to do so.

The circuit court further found that the forensic interviewer acted in bad faith by "obvious[ly] attempt[ing] to conceal M.R.W.'s written corrections." (*Id.* at 26.) Indeed, the circuit court found that the interviewer had immediately recognized the exculpatory nature of the list and hurried to terminate the interview before additional changes could be disclosed. (*Id.* at 23–24.) Similarly, the court found that the MPD detective had recognized the significance of the list and had acted in bad faith by intentionally mischaracterizing and minimizing it in her police report. (*Id.* at 26.) Finally, the court concluded that the defendant could not have obtained comparable evidence by any reasonably available means, and the only proper remedy for this misconduct was to vacate the judgment of conviction and dismiss the case with prejudice.

## C. The Wisconsin Court of Appeals' decision

The state appealed the circuit court's decision, and the Wisconsin Court of Appeals reversed, concluding that the circuit court should have rejected Nichols' ineffective assistance and due process arguments because Nichols had failed to show that M.R.W.'s list had any exculpatory value. Nichols then appealed, but the Wisconsin Supreme Court denied his petition for review. He filed his habeas petition in this court in October of 2018.

## ANALYSIS

Petitioner Nichols contends that his conviction should be vacated because: (1) the state violated his due process rights by failing to preserve the list created by M.R.W. identifying changes to statements made after her first forensic interview; and (2) his trial counsel was ineffective by failing to challenge the state's due process violation before trial. As a preliminary matter, Nichols' ineffective assistance of counsel claim is procedurally defaulted because he failed to include it in the petition for review submitted to the Wisconsin Supreme Court, *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999), and Nichols' argument that his due process claim encompassed his ineffective assistance claim is neither persuasive nor supported by any citation to legal authority. *See Sweeney v. Carter*, 361 F.3d 327, 332–33 (7th Cir. 2004) (petitioner must present operative facts and legal principles to each level of state court review). Moreover, even if Nichols' ineffective assistance claim was not procedurally defaulted, it would fail on the merits since it is premised on a due process claim that fails for the reasons discussed below. Accordingly, the court need not address Nichols' ineffective assistance claim further in this opinion.

As for the remainder of his habeas petition, Nichols must show that he is in custody in violation of the Constitution, laws or treaties of the United States.² 28 U.S.C. § 2254(a). Because the Wisconsin Court of Appeals addressed the merits of Nichols' due process and ineffective assistance of counsel claims, this court's review is subject to a particularly deferential standard of review under 28 U.S.C. § 2254(d)(1). Under § 2254(d)(1), Nichols is not entitled to relief unless he shows that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." A decision is contrary to clearly established federal law "if the rule the decision applies differs from governing law set forth in Supreme Court cases." *Bailey v. Lemke*, 735 F.3d 945, 949–50 (7th Cir. 2013) (citations omitted). A decision involves an unreasonable application of Supreme Court precedent "if the decision, while identifying the correct governing rule of law, applies it unreasonably to the facts of the case." *Id.*

Alternatively, Nichols can obtain relief if he shows that the state court's adjudication of his claims was based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). Again, however, the federal court owes deference to the state court, especially the underlying state court findings of fact and credibility determinations against a petitioner, which are all presumed correct unless the petitioner comes forth with clear

---

² The "in custody" requirement of 28 U.S.C. § 2254 applies only "at the time the petition was filed." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). Although Nichols completed his five-year probation sentence while his habeas petition was pending, Nichols satisfies this requirement because he filed his petition before his sentence was complete. In addition, his petition is not moot because he remains subject to ongoing collateral consequences of his conviction, in particular having to register as a sex offender. *See id.* (ongoing "collateral consequences" of conviction satisfy constitutional case or controversy requirement even if petitioner's sentence has expired).

and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014); *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013).

Here, Nichols argues that the state violated his Fourteenth Amendment due process rights by failing to preserve and provide the written list that M.R.W. brought to her second forensic interview. The Constitution requires the government to preserve and disclose evidence that "might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 489 (1984). This means that the state must preserve and disclose "material" evidence. *Jones v. York*, 34 F.4th 550, 561 (7th Cir. 2022). Evidence is "material" if there is a "reasonable probability" that if disclosed, "the result of the proceeding would have been different." *Id.* However, the Constitution does not impose on the state "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). If evidence is only potentially useful, the state does not violate due process unless: (1) the exculpatory nature of the evidence was apparent before its destruction; (2) the government acted in bad faith by failing to preserve the evidence; and (3) the defendant could not obtain the same evidence anywhere else. *Jones*, 34 F.4th at 558–59; *Tabb v. Christianson*, 855 F.3d 757, 767 (7th Cir. 2017); *United States v. Fletcher*, 634 F.3d 395, 407 (7th Cir. 2011).

Thus, in *Trombetta*, the Supreme Court rejected a due process challenge based on the state's failure to preserve results of a breath test because the chances were "extremely low" that the evidence would have been exculpatory. 467 U.S. at 489. Similarly, in *Youngblood*, the Supreme Court held that the state's failure to preserve DNA samples did not violate the petitioner's due process rights because: (1) the evidence was only potentially exculpatory; and (2) there was no showing of bad faith. 488 U.S. at 55, 58–59.

9

In evaluating Nichols' due process claim, the Wisconsin Court of Appeals applied the correct federal legal standards, relying the Supreme Court's decisions in *Trombetta* and *Youngblood*, as well as Wisconsin state court cases applying those decisions. (Dkt. #5-6, at 14.) The court went on to conclude that Nichols' claim failed because he had not shown that M.R.W.'s list had any exculpatory value. (*Id.* at 15.) In particular, it noted that neither Nichols nor the circuit court in its decision suggested "that the list was exculpatory because the list may have corrected some fact in M.R.W.'s initial interview in a manner supporting the view that the sexual touching did not happen." (*Id.* at 10–11.) Thus, regardless the contents of the list, the court found it would not undermine M.R.W.'s consistent testimony about the sexual touching incident that provided the basis for both the charge and conviction obtained against Nichols.

The court of appeals also flatly rejected the argument that the state was required to preserve the list due to its potential impeachment value. Instead, the court found that the list "would have enhanced, not impeached, M.R.W.'s credibility." (*Id.* at 11.) Specifically, "[t]he only reasonable inference from the facts—that M.R.W. had reviewed the first interview before participating in the second interview, and that she had a list of changes to make of some things she said in the first interview—is that she spoke accurately, truthfully, and consistently with her corrections, in the second interview." (*Id.*) For these reasons, the court of appeals concluded Nichols had failed to demonstrate that "whatever else was on the list would tend to, or lead to evidence that would tend to, establish Nichols's innocence." (*Id.* at 12.)

Although the court of appeals might have given greater deference to the circuit court's credibility determinations and superior view of the facts at the original criminal trial, its decision was a reasonable application of *Trombetta* and *Youngblood*, which is as far as a federal

10

court can inquire as part of a habeas review. In particular, since M.R.W.'s list no longer exists, neither Nichols, nor the state nor the state courts know what was on the list, and the "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–10 (1976). Here, the court of appeals further concluded that the list was not material and would not have changed the outcome of the trial because M.R.W.'s testimony regarding the fundamental issue in the case -- whether Nichols sexually assaulted her -- was consistent during both forensic interviews and at trial. This is enough to meet this court's deferential review standard.

At most, Nichols' counsel might have used the list to impeach M.R.W.'s memory of certain events, but the court of appeals was permitted to find as speculative the circuit court's assertion that the list would have been "devastating" to M.R.W.'s credibility. (Dkt. #5-6, at 12). Regardless, M.R.W.'s list was plainly the sort of "potentially useful evidence" referred to in *Trombetta* and *Youngblood*, not material, exculpatory evidence that the state was mandated to preserve. This means that Nichols could establish a due process violation only by showing that the state acted in bad faith by failing to preserve it, and as the court of appeals found, at least implicitly, the evidence did not support the circuit court's finding of bad faith. Among other things, the court of appeals reviewed the video footage of M.R.W.'s second forensic interview and rejected as speculative the circuit court's finding that both the forensic interviewer and detective believed the list to be exculpatory. Contrary to the circuit court's findings, the court of appeals also noted that the interviewer was patient, gave M.R.W. several opportunities to ask questions, and responded empathetically when M.R.W. discussed her list. (Dkt. #5-6, at 13.) Whether this court would have deferred to the circuit court's findings or not, the court

11

of appeals' conclusion neither falls "well outside the bounds of permissible difference of opinion" nor is contrary to "the clear and convincing weight of the evidence" that is required to support habeas relief. *Morgan v. Hardy*, 662 F.3d 790, 800–01 (7th Cir. 2011).

Moreover, bad faith requires more than carelessness; it requires a "conscious effort to suppress exculpatory evidence." *United States v. Chaparro–Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000) (citation omitted); *see also Youngblood*, 488 U.S. at 57–58 ("Mere negligence by police absent a showing of bad faith does not constitute a constitutional violation."). Nichols presents no evidence of such an effort by the interviewer, MPD detective or the state; instead, at most, the evidence shows the interviewer and detective were careless in failing to preserve M.R.W.'s list or inquire further because they did not deem the list significant.

Ultimately, therefore, petitioner has not identified any basis on which this court could conclude that the Wisconsin Court of Appeals' rejection of Nichols' due process or ineffective assistance claims were based on an unreasonable application of clearly established federal law or fell "well outside" the boundaries of permissible differences of opinion. *See Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (federal court cannot grant habeas relief unless state court decision was "'unreasonable,' which means something like lying well outside the boundaries of permissible differences of opinion").

As a result, the only remaining question on habeas review is whether to grant Nichols a certificate of appealability. Under Rule 11 of the Rules Governing Section 2254 Cases, the court must issue or deny a certificate of appealability when entering a final order adverse to a petitioner. To obtain a certificate of appealability, the applicant must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). This means that "reasonable jurists could debate whether (or, for that

matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations and citations omitted). Here, Nichols has not made a showing, substantial or otherwise, that his conviction was obtained in violation of clearly established federal law as decided by the Supreme Court. Because this court finds that no reasonable jurists would debate whether the Wisconsin Court of Appeals' decision unreasonably applied clearly established federal law, or based its decision on an unreasonable interpretation of the facts, the court will not issue petitioner a certificate of appealability.

ORDER

IT IS ORDERED that:

1. Petitioner Karl Nichols's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is DENIED.
2. Nichols is DENIED a certificate of appealability.

Entered this 17th day of October, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge